Gregory J. Morrow, Esq. (SBN 153224)
**MORROW LAW GROUP INC**
1801 Century Park East
24th Floor
Los Angeles, CA 90067
O:  (310) 894-9149
M: (310) 721-3833
gregory.j.morrow@hotmail.com

Attorneys for Plaintiffs
Preston McCormick and
East Wind Ag

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PRESTON MCCORMICK, an individual; and EAST WIND AG, a California corporation,<br><br>    Plaintiffs,<br><br>    v.<br><br>COUNTY OF RIVERSIDE, a public entity; JEFFREY ANTHONY VAN WAGENEN, JR., an individual and in his official capacity; RIVERSIDE COUNTY SHERIFF'S DEPARTMENT, a division of a public entity; SHERIFF CHAD BIANCO, an individual and in his official capacity; JOSE-TRUJILLO VILLASENOR, an individual and in his official capacity; IMPERIAL IRRIGATION DISTRICT, a public entity; JAMIE L. ASBURY, an individual and in her official capacity; and DOES 1 through 150, individually, jointly and severally,,<br><br>    Defendants. | Case No. 5:23-cv-02569-SSS-SP<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT PURSUANT TO FRCP RULE 56)**<br><br>*Filed concurrently with Plaintiffs' Statement of Genuine Disputed Facts, Declarations of Gregory J. Morrow, Michael Lujan, John Tahsuda, and Elaine Penalosa, all in Support Thereof*<br><br>Hearing Date:  February 20, 2025<br>Time:            2:00 p.m.<br>Courtroom:    2nd Floor<br><br>(Hon. Sunshine S. Sykes, Presiding) |

1

**TO THE HONORABLE COURT, DEFENDANTS, ALL INTERESTED PARTIES AND TO THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that, pursuant to Federal Rules of Civil Procedure Rule 56, Plaintiffs PRESTON MCCORMICK and EAST WIND AG (collectively "Plaintiffs"), hereby submits the following Opposition to Defendants COUNTY OF RIVERSIDE, JEFFREY ANTHONY VAN WAGENEN, JR., SHERIFF CHAD BIANCO, and JOSE TRUJILLO VILLASENOR (collectively "Defendants") Motion for Summary Judgment ("MSJ").

The stipulated admissions are not dispositive because they resulted solely from procedural circumstances rather than substantive agreement with the actual facts that remain in controversy between the parties.

The Court must look beyond these technical admissions to examine the actual merits of the case, particularly where fundamental jurisdictional questions regarding tribal sovereignty are most certainly at stake. These admissions were the result of procedure and therefore cannot override the substantive legal questions central to this dispute: the egregious wholesale violation of Plaintiffs' civil rights and, by extension, the deplorable and reprehensible violation of the Tribe's sacred tribal land.

Deciding Defendants' MSJ purely as to such stipulations is in direct conflict what the Ninth Circuit has already recognized: that public policy strongly favors disposition of this case on the merits.

2

Case No. 5:23-cv-02569-SSS-SP
*Plaintiffs' Opposition to Defendants'*
*Motion for Summary Judgment*

Defendants' Motion for Summary Judgment should be denied because:

1.    Plaintiffs' First Cause of Action based on "Monell Policies, Customs, Conduct, and Practices – 42 U.S.C. § 1983" withstands Defendants' MSJ.

2.    In the same way, Plaintiffs' Second Cause of Action resounding in "Failure to Hire, Train, Supervise, and Discipline, 42 U.S.C. § 1983" must be upheld and Defendants are not entitled to assert qualified immunity.

3.    Plaintiffs' Third Cause of Action for "Failure to Protect from Harm – 42 U.S.C. § 1983" is shown from highly contested and controverted facts and must be retained by Plaintiffs.

4.    Plaintiffs' Fourth Cause of Action based on "Failure to Provide Medical Care – 42 U.S.C. § 1983" must also be upheld by this Court, devoid of any supposed qualified immunity.

5.    Plaintiffs' Fifth Cause of Action as to "Negligence" is obviously demonstrated by the abundant facts set forth in detail by Plaintiffs.

6.    Plaintiffs' Sixth Cause of Action asserting "Battery" is warranted and withstands MSJ.

7.    Plaintiffs' Seventh Cause of Action based on "Assault" is demonstrated by the highly contested facts and admissible evidence set forth herein.

8.    Plaintiffs' Eighth Cause of Action for "Intentional Infliction of Emotional Distress" is apparent by the contested facts of this case.

*Case No. 5:23-cv-02569-SSS-SP*
*Plaintiffs' Opposition to Defendants'*
*Motion for Summary Judgment*

9. Plaintiffs' Ninth Cause of Action claiming "Intentional Interference with Contractual Relations" is clearly demonstrated by contested facts so as to be upheld.

10. Plaintiffs' Tenth Cause of Action based on "Negligent Interference with Prospective Economic Relations" is clear and apparent due to disputed facts in this case.

11. Plaintiffs' Eleventh Cause of Action alleging "Intentional Interference with Prospective Economic Relations" should be sustained by this Court.

12. Plaintiffs' Twelfth Cause of Action as to "Vicarious Liability in Tort" is demonstrated where the contested facts and controverted evidence show the validity of this claim.

13. Plaintiffs' Thirteenth Cause of Action based on "Violation of California Civil Code § 52.1 (Tom Bane Act)," where the contested facts and controverted evidence demonstrate that there is certainly a constitutional violation with Defendants acts of malice and bias.

14. Finally, Plaintiffs' Fourteenth Cause of Action for "Declaratory Relief – 28 U.S.C. § 2201" is fully just and proper as civil oversight of Defendants is long past due.

Plaintiffs' Opposition is based on this Notice and Memorandum of Points and Authorities, the Declarations of Gregory J. Morrow, Michael Lujan, John Tahsuda, and Elaine Penalosa, Appendix of Evidence and Exhibits thereto, the Statement of

Genuine Disputed Fact, filed concurrently herewith, the file and records in this case, and any further argument or evidence that the Court deems fit to receive at the hearing on this Motion.

Dated: January 16, 2026                                **MORROW LAW GROUP INC.**

_____

Gregory J. Morrow

*Case No. 5:23-cv-02569-SSS-SP*
*Plaintiffs' Opposition to Defendants'*
*Motion for Summary Judgment*

# TABLE OF CONTENTS

I.     INTRODUCTION………………………………………......…..8

II.    STATEMENT OF FACTS…………………………………….12

III.   STANDARD OF REVIEW……………………………………24

IV.    ARGUMENT…………………………………………………...24

A. The Parties' Stipulation was Intended to Resolve Only Procedural Issues and is Not Dispositive for Summary Judgment……………………………………….24

B. The Facts Presented By Plaintiffs Conclusively Demonstrate A Monell Claim (42 U.S.C. § 1983)……………….26

C. The Facts Presented By Plaintiffs Conclusively Demonstrate Supervisory Liability for "Failure to Hire, Train, Supervise, and Discipline" (42 U.S.C. § 1983)…….27

D. The Facts Presented By Plaintiffs Conclusively Demonstrate A Failure To Protect From Harm (42 U.S.C. § 1983)…………………………………..28

E. The Facts Presented By Plaintiffs Conclusively Demonstrate A Failure To Provide Medical Care (42 U.S.C. § 1983)…………………………………30

F. The Facts Presented By Plaintiffs Conclusively Demonstrate Negligence……………………………………30

G. The Facts Presented By Plaintiffs Conclusively

Demonstrate Battery…………………………………………..31

H. The Facts Presented By Plaintiffs Conclusively

Demonstrate Assault……….…………………………………..32

I. The Facts Presented By Plaintiffs Conclusively

Demonstrate Intentional Interference with

Contractual Relations……………………………………………31

J. The Facts Presented By Plaintiffs Conclusively

Demonstrate Intentional Interference with

Prospective Economic Advantage……………………………31

K. Defendants Had No Authority to Attempt to Enforce

State Law on Sovereign Indian Tribal Land……………………32

L. California's Cannabis Laws Are Civil Regulatory not

Criminal Prohibitory and Cannot be Enforced

on Sovereign Indian Tribal Land…………………………………..34

V.   CONCLUSION……………………………………………………35

# TABLE OF AUTHORITIES

**United States Constitution**

Fourth Amendment (U.S. Const. amend. IV)……………………………………30

Fourteenth Amendment (U.S. Const. amend. XIV)………………………….4, 32

Indian Commerce Clause (art. I, § 8, cl. 3)………………………………….36

**Federal Cases**

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)……………………………………………………28

*Barona Grp. of Capitan Grande Band of Mission Indians v. Duffy,*
   694 F.2d 1185 (9th Cir. 1982)……………………………………………38

*Bryan v. Itasca County,*
   426 U.S. 373, 389 (1976)………………………………………………37

*California v. Cabazon Band of Indians*,
   480 U.S. 202, 208 (1987)………………………………………………38

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)……………………………………………………28

*Conlon v. U.S.*,
   474 F.3d 616 (9th Cir. 2007)……………………………………………...29

*County of Oneida v. Oneida Indian Nation,*
   470 U.S. 226 (1985)……………………………………………………37

*EEOC v. Karuk Tribe Hous. Auth.*,
260 F.3d 1071, 1077 (9th Cir. 2001)……………………………………….39

*Fisher v. District County Court,*
   424 U.S. 382 (1987)……………………………………………………37

*Gibson v. County of Washoe,*
  290 F.3d 1175 (9th Cir. 2002)……………………………………………..31, 32

*Gordon v. Cnty. of Orange,*
  6 F.4th 961 (9th Cir. 2021)………………………………………30, 31, 32, 33

*In re Phenylpropanolamine (PPA) Prods. Liab. Litig.,*
460 F.3d 1217, 1228 (9th Cir. 2006)……………………………………..28

*Jefferson v. Perez,*
  2012 WL 671917, at *2 (E.D. Cal. Feb. 29, 2012)………………………….29

*Matsushita Elec. Indus. Co. v. Zenith Radio,*
  475 U.S. 574 (1986)…………………………………………………28

*McClanahan v. Arizona State Tax Comm'n,*
  411 U.S. 164 (1973)………………………………………………….36

*Michigan v. Bay Mills Indian Cmty.,*
  572 U.S. 782  (2014)………………………………………………….36

*Perez v. Miami-Dade Cnty.,*
  297 F.3d 1255 (11th Cir. 2002)………………………………………...29

*Reeves v. Sanderson Plumbing Prods., Inc.,*
  530 U.S. 133 (2000)………………………………………………….28

*Seminole Tribe v. Fla.,*
  517 U.S. 44 (1996)…………………………………………………36

*Taylor v. Cnty. of Calaveras,*
  2019 WL 6341131, at *4 (E.D. Cal. Nov. 27, 2019)……………………..29

*U.S. v. Culter,*
676 F.2d 1245 (9th Cir. 1982)………………………………………...29

*United States v. Forty-Three Gallons of Whiskey,*
93 U.S. 188 (1876)…………………………………………………36

*Case No. 5:23-cv-02569-SSS-SP*
*Plaintiffs' Opposition to Defendants'*
*Motion for Summary Judgment*

**State Cases**

*Ladd v. County of San Mateo,*
12 Cal.4th 913, 917 (1996)………………………………………………………33

*Lowry v. Standard Oil Co. of California,*
  63 Cal.App.2d 1 (1944)…………………………………………………………35

*People v. Mansfield,*
  200 Cal.App.3d 82 (1988)………………………………………………………34

*Plotnik v. Meihaus,*
  208 Cal. App. 4th 1590 (2012)…………………………………………………34

*Redfearn v. Trader Joe's Co.,*
  20 Cal.App.5th 989 (2018)……………………………………………………..35

*Settimo Associates v. Environ Systems, Inc.,*
  14 Cal.App.4th 842 (1993)……………………………………………………..36

**Federal Statutes**

18 U.S.C. § 1162………………………………………………………..12, 37

28 U.S.C. § 1360…………………………………………………………37

42 U.S.C. § 1983…………………………………………16, 30, 31, 32, 33

**State Statutes**

Cal. Bus. & Prof. Code § 26000………………………………………...38

Cal. Health & Safety Code § 11362.1…………………………………….38

Cal. Health & Safety Code § 11362.1-.4………………………………...38

Public Law 280……………………………………………………13, 37

**Other Authorities**

Fed. R. Civ. P.
  Rule 36(b)………………………………………………………………………29
  Rule 56(b)………………………………………………………………………..2

Attorney General Rob Bonta, Attorney General Bonta Launches Civil Rights Investigation into Riverside County Sheriff's Office (February 23, 2023); https://oag.ca.gov/news/press-releases/attorney-general-bonta-launches-civil-rights-investigation-riverside-county.........................................................................................................................12

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

This case is brought against a backdrop of a well-documented pattern, practice, and custom of repeated violations of the civil rights of the citizens of Riverside County, California, committed by the Riverside County Sheriff's Department[1] ("RSO"), including the civil rights of Plaintiffs and, by extension, the sovereign rights of the Torres Martinez Desert Cahuilla Indians (the "Tribe"). SGDF 16-267

Indeed, Plaintiffs are just a few of the litany who have been deprived of their civil rights by the actions of the RSO.[1]

On December 7, 2022, in the pre-dawn hour of approximately 4:45 A.M., the RSO executed a facially invalid Search Warrant[2] (the "Warrant") in a predawn raid consisting of approximately 250 heavily armed uniformed officers, including members of SWAT and other law enforcement agencies, utilizing military-style vehicles at a validly licensed and authorized marijuana agricultural facility located at 91521 Avenue 68, Mecca, California 92254 (the "Subject Property"). SGDF 16-274

---

[1] Attorney General Rob Bonta, Attorney General Bonta Launches Civil Rights Investigation into Riverside County Sheriff's Office (February 23, 2023); https://oag.ca.gov/news/press-releases/attorney-general-bonta-launches-civil-rights-investigation-riverside-county

[2] As a matter of law, neither 18 U.S.C. § 1162 nor any other Act of Congress conferred any jurisdiction to authorize any of the Defendants to commit any of the acts as alleged in the Complaint, including but not limited to submitting an Affidavit or seeking issuance of the Search Warrant at issue in this case, rendering such Search Warrant void *ab initio* and rendering the execution of such Search Warrant as well as the many other acts associated therewith as *ultra vires* and contrary to federal law governing jurisdiction in "*Indian country*." (emphasis added).

Well over a year prior to Defendants' unlawful action, the Subject Property had been placed in Trust with the United States of America for the benefit of the Torres Martinez Desert Cahuilla Indians (the "Tribe"), and dutifully recorded with the U.S. Department of the Interior, Bureau of Indian Affairs ("BIA"), Land Titles and Records Office, on February 19, 2021, Document Number: 4200197218")[3]. SGDF 16-267

The Tribe is a relatively impoverished nation with little to any source of income, who look to their lawfully authorized agricultural facilities as a means to uplift their people from dire economic despair. SGDF 19

The lead officer during the execution of this Warrant, Defendant Jose Trujillo Villasenor ("Villasenor"), had previously sworn under oath in his supporting Affidavit leading to the issuance of the Warrant at issue in this case as to purported "facts" including the patently false statement that the Subject Property was allegedly not "trusted land" (sic) and therefore not sovereign Indian tribal land subject to protection under federal law. SGDF 16-283

This Affidavit ironically sets forth that, on October 27, 2022, Plaintiff Preston McCormick ("McCormick") hand-delivered to RSO's Thermal Station a copy of Plaintiffs' official "Manufacturing License" issued by the Tribe. SGDF 16-175

---

[3] Such Grant Deed provides, in pertinent part, that "[t]his conveyance is made pursuant to Title VI of the Omnibus Indian Advancement Act, Public Law 106-568, 114 Stat. 2868, enacted December 27, 2000, the Torres Martinez Desert Cahuilla Indians Claims Settlement Act."

*Case No. 5:23-cv-02569-SSS-SP*
*Plaintiffs' Opposition to Defendants'*
*Motion for Summary Judgment*

During deposition, Villasenor repeatedly testified that Defendants considered the Tribe to be a "*criminal enterprise*" and "*criminal organization*" simply for permitting the cultivation and "*manufacturing of cannabis*" on sovereign Indian tribal land pursuant to the Tribe's own promulgated regulations. SGDF 16-175

At the commencement of this raid, members of the Tribe, including Ms. Elaine Penalosa ("Penalosa"), Board Member of the Tribe's Desert Cahuilla Agricultural Commission ("DCAC") overseeing all agricultural facilities on the Tribe's land, arrived at the Subject Property to present Villasenor with the Tribe's official BIA Grant Deed showing it was sovereign tribal land, and to plead with Villasenor to immediately cease this raid. Villasenor dismissed such documents off-hand as somehow "*invalid*" and "*no good*" and rejected the Tribe's fervent pleas to stop with the destruction of their sovereign land. SGDF 16-175

Defendants proceeded to lay waste to the entire agricultural facility at issue in this case, destroying over 270 greenhouses and irrigation systems, seizing countless thousands of documents, ripping out and destroying computer and surveillance systems, and arresting and detaining many individuals, including McCormick who was handcuffed behind his back face down in the dirt in front of his wife and periodically interrogated for up to eight hours in excruciating pain. SGDF 38-232

Defendants repeatedly base their Motion on the conjunctive phrase "uncontroverted facts **and** Plaintiffs' 100 stipulated deemed admissions" yet Defendants completely fail to set forth any admissible facts that are uncontroverted

and, instead, are highly contested and controverted by way of this Opposition as well as throughout the Declarations and Exhibits that Plaintiffs submit in support of such Opposition.

Defendants' reliance on supposed deemed admissions is misplaced as all supposed admissions were fully "denied" by Plaintiffs. SGDF 8.  And each and every one of these admissions are on their face *per se* impermissible as seeking to establish legal conclusions and render undisputed material facts of the case.

When Plaintiffs advised Defendants of Plaintiffs desire to withdraw all 132 admissions Defendants counsel responded that Defendants would seek attorney's fees and sanctions if Plaintiffs were to move to withdraw all such admissions.  SGDF 9

As Plaintiffs attempted to do so pursuant to L.R. 37, Defendants refused to promptly return the required joint stipulation authorizing Plaintiffs to affix their electronic signature and advance Plaintiffs Motion. SGDF 9, relegating Plaintiffs to stipulate in order to then attempt to withdraw only 32 of these 132 facially impermissible admissions.

The purpose and intent of that second Stipulation is self-evident from the language used in the very first paragraph: "as part of Plaintiffs' forthcoming Motion to Withdraw and Amend Admissions, to resolve any **procedural issues** regarding the timing and scope of Plaintiffs' Motion." SGDF 9-86

That Stipulation was to advance Plaintiffs' initial Motion, nothing more.  SGDF 9

*Case No. 5:23-cv-02569-SSS-SP*
*Plaintiffs' Opposition to Defendants'*
*Motion for Summary Judgment*

Plaintiffs' intent for agreeing to enter into this procedural Stipulation that deemed all other requests for admissions admitted was for the express purpose of advancing Plaintiffs' initial Motion to Withdraw and, by doing so, also reserved their right to withdraw remaining 100 admissions or adequately modify or set aside this Stipulation in order to do so. SGDF 9-86

And it was certainly never the intent of Plaintiffs for that language in such stipulation to be construed to serve as a complete bar that would in any way forever foreclose Plaintiffs ability to bring a subsequent motion to withdraw additional admissions or to be used as a means by Defendants to move for summary judgment or, for that matter, at the trial of this case.

Finally, Defendants consciously fail to even mention that Plaintiffs have already withdrawn 32 "deemed" admissions that cut to the very core merits of Plaintiffs' action: (1) all civil rights violations (42 U.S.C. § 1983 and related claims); (2) duty/breach; and (3) causation/damages. SGDF 10-15

## II.  STATEMENT OF FACTS

1.  The Tribe is relatively impoverished, having little source of income aside from the use of their sovereign Indian tribal reservation land for lawfully authorized agricultural facilities as a means to uplift their people from dire economic despair. SGDF 19

2.  In 2016, the Tribe created the Desert Cahuilla Agricultural Corporation ("DCAC") to establish rules and regulations governing all aspects of agricultural

development on the Tribe's sovereign Indian tribal land including commercial cultivation of cannabis. SGDF 16, 26, 39

3.      DCAC had full force of tribal law to "regulate the purchase, production, possession, processing, packaging, storing, transporting, selling, and receipt of marijuana and marijuana products" on the Tribe's sovereign Indian tribal land, including the cultivation of marijuana on at 91521 Avenue 68 in Mecca, California, 92254, County of Riverside, California (the "Subject Property").  SGDF 16, 26, 39

4.      The Tribe also instituted a Cannabis Control Commission ("Commission"), responsible for regulating persons on the Tribe's sovereign Indian tribal land in relationship to the health, safety, and welfare as to the cultivation of cannabis, including on the Subject Property. SGDF 16, 26, 39

5.      On January 16, 2017, the Tribe promulgated the Cannabis Control Commission Regulations, acknowledging the State of California's legalization of cannabis and  setting forth express policies and procedures in order to civilly regulate those persons on the Tribe's reservation as to all aspects of cannabis cultivation on the Tribe's sovereign Indian land (the "Regulations"). SGDF 16, 26, 39

6.      The Commission, closely monitors every aspect of each cannabis plant under cultivation, including tagging and testing of each individual plant, weekly status reports, the amount of cannabis under cultivation, including the entire development of cannabis from seed to harvest. SGDF 16, 26, 39

7.      Commission is also charged with the authority to control and monitor

*Case No. 5:23-cv-02569-SSS-SP*
*Plaintiffs' Opposition to Defendants'*
*Motion for Summary Judgment*

activities of farmers and others engaged in the lawful cultivation of cannabis on sovereign Indian tribal land. SGDF 16, 26, 39

8. On December 29, 2017, the Tribe obtained written approval from the United States Department of the Interior, Bureau of Indian Affairs ("BIA") as to the Tribe's "Business Leasing Regulations" permitting the Tribe to lease portions of the Tribe's sovereign Indian tribal land, including the Subject Property at issue in this case SGDF 16

9. On February 19, 2021, the Tribe officially recorded the Subject Property with the U.S. Department of the Interior, Bureau of Indian Affairs, Land Titles and Records Office ("BIA") pursuant to a Grant Deed, Document Number: 4200197218, officially recognizing that the Subject Property was now the Tribe's sovereign Indian tribal land. SGDF 27-28, 32, 39

10. On August 8, 2022, Plaintiffs executed a "Business Land Sublease Agreement" (the "Lease") by and between the Tribe's Sovereign Medical Tribal Corporation and East Wind Ag in order to lease the Subject Property for a term of ten years. SGDF 16

11. On August 8, 2022, Plaintiffs submitted a completed DCAC Application to obtain a license to lawfully conduct our cannabis cultivation agricultural business on the Subject Property. SGDF 16

12. On September 19, 2022, based on DCAC's review of Plaintiffs Application and supporting documents, the Commission issued a written License to

18

Plaintiffs company East Wind Ag (the "License") that legally authorized us to commence conducting our cultivation of cannabis as an agricultural facility, for the exclusive benefit of and on behalf of the Tribe, exclusively on the Subject Property pursuant to the Tribe's Regulations, the License and the Lease.

13.    I did not submit Plaintiffs Application or enter into the Lease of the Subject Property with the Tribe until August 8, 2022, or long after the date that the Subject Property had become bona fide sovereign Indian tribal land once the Tribe officially recorded the Subject Property with BIA on February 19, 2021.

14.    On December 5, 2025, or two days before the raid, Plaintiffs were only cultivating cannabis in approximately 75 greenhouses out of a total 280 greenhouses.

15.    Plaintiffs installed cannabis irrigation systems, surveillance equipment, fencing, employment compliance procedures, and other related business on the Subject Property.

16.    In exchange for allowing lawful cultivation of cannabis in and on the Subject Property, Plaintiff was contractually obligated pursuant to the Lease to remit monthly rent as well as pay taxes to the Tribe on all cannabis cultivated exclusively on the Subject Property and, only after reaching full maturity, that cultivated cannabis would ultimately be harvested and submitted directly to the Tribe because the Tribe maintained exclusive ownership of all cannabis at all times.

17.     To ensure our company's ongoing compliance with Tribe's Regulations, the Tribe also maintained its own separate satellite office on the Subject Property during the term of the Lease.

18.     Moreover, to ensure ongoing compliance with the Tribe's pertinent Regulations, McCormick physically relocated his family home and moved into a residence located on the Subject Property, located outside of the cannabis cultivation area.

19.     The Commission heavily regulated Plaintiffs cultivation of cannabis on the Subject Property, including requiring the use of certain certified seeds and approved fertilizers, conducting systematic and random physical inspections and examinations at the Subject Property in order to oversee, test, tag, and track all cannabis Plaintiffs cultivated and to ensure that all third-party farmer contractors used to cultivate cannabis on the Subject Property were properly interviewed, credentialed, and vetted, including having everyone associated with Plaintiffs business to first pass a civil and criminal background check as a condition of compliance before being allowed to enter on to the Subject Property.

20.     The facilities were properly fenced, segregated, and secured (including using chain link and security fencing), along with hiring 24-hour security guards stationed at the access gate to the Subject Property, as well as installing security video monitoring. The Subject Property's only perimeter entrance and exit were also clearly marked with large written signs and placards, warning everyone against trespassing,

Case No. 5:23-cv-02569-SSS-SP
*Plaintiffs' Opposition to Defendants'*
*Motion for Summary Judgment*

alerting as to security surveillance, and notifying that the Subject Property was situated on a federal Indian reservation.

21.    At the entrance to Plaintiffs' agricultural facility located on the perimeter of the Subject Property, we posted large, approximately six by four foot, signs that read in bold red lettering "**<span style="color:red">NO TRESSPASSING</span>**" and "**<span style="color:red">FEDERAL INDIAN RESERVATION</span>**" to clearly notify everyone that the Subject Property was sovereign Indian tribal land belonging to the Tribe.

22.    Pursuant to the Tribe's Regulations, each cannabis plant was properly tagged for identification and subject to tracking for "traceability" purposes, and each person, including our independent farmer contractors, working on or at the Subject Property were vetted and approved and required to possess a Security Clearance Identification credentials issued by the Tribe in order to be scanned by and pass our security guards at the entrance to the Subject Property in order to be permitted to enter onto the Subject Property.

23.    On or about November 2022, Plaintiffs learned of news reports that an allegedly unauthorized and unlicensed cannabis farm, supposedly located on unincorporated land of Defendant County of Riverside, had been raided and systematically destroyed by Defendant Riverside County Sheriffs' Office ("RSO").

24.    Shortly thereafter, Plaintiff observed what appeared to be an RSO helicopter hovering over our lawful agricultural facility.

25.    McCormick immediately became concerned and wanted to do everything necessary to ensure that the Subject Property as well as Plaintiffs lawful business located on the Subject Property would not also be raided and destroyed by the RSO.  His understanding from the Tribe was that a license or permit from the State of California was not required as the Subject Property was sovereign tribal land governed exclusively by the Tribe's Regulations.  Given Plaintiffs Lease for the Subject Property was on tribal land, and Plaintiffs obtained cannabis cultivation License issued from the Tribe, Plaintiff wanted to make sure that the RSO was aware of these facts.

26.    On November 22, 2022, I traveled to Defendant RSO's Thermal Station, located in the County of Riverside, California, with a copy of Plaintiffs Tribal License and Plaintiffs handwritten note, which stated, to the effect, "*Plaintiffs name is Preston McCormick I am providing a copy on Plaintiffs Cannabis License issued by the Torres Martinez Tribe to inform the Sheriff's Department we are operating legally on sovereign Indian tribal land.  If you need any additional information I can be contacted at 972-375-2824*", and after this meeting, I memorialized Plaintiffs handwritten note into a typed out version.

27.    Plaintiff met with the RSO Thermal Station's intake clerk/officer and explained in detail that Plaintiffs cannabis cultivation business was both legal and licensed by the Tribe and that the Subject Property itself was located exclusively on the Tribe's sovereign Indian tribal land.

22

28.    McCormick presented the intake clerk/officer with a copy of the License along with a note with his name and telephone number, offering to voluntarily provide whatever information RSO needed to confirm Plaintiffs' business was located on sovereign Indian tribal land operating lawfully pursuant to the valid License. SGDF 25-86

29.    The Thermal Station intake clerk provided these documents to the RSO's officer in charge and asked whether such RSO officer would be willing to meet with McCormick to discuss the lawful nature of Plaintiffs' cannabis cultivation business on sovereign Indian tribal land; however, after approximately 20-30 minutes, the intake clerk returned stating the Officer on Duty did not have time.  SGDF 16-134

30.    Between the time that McCormick left the License with RSO and Defendants' illicit raid at Plaintiffs' agricultural facility located on the Subject Property, McCormick never received any correspondence or communication from RSO.  Had RSO simply reached out or communicated with Plaintiffs, McCormick would promptly provide RSO with whatever documentation RSO needed, including a copy of the Lease, the Regulations, and the BIA Grant Deed demonstrating that the Subject Property was sovereign Indian tribal land of the Tribe, in order to fully satisfy RSO as to the lawful status of Plaintiffs' cannabis cultivation operating on the Subject Property that was clearly0 sovereign Indian tribal land of the Tribe. SGDF 19-123

31.    Instead, on December 7, 2022, at approximately 4:45 a.m., McCormick was at home with his wife on the Subject Property when awakened by RSO officers

on a loudspeaker announcing, to the effect, that "***THIS IS THE RIVERSIDE SHERIFFS DEPARTMENT…SURRENDER AND COME OUT WITH YOUR HANDS UP***."

32.    McCormick promptly complied with RSO's commands, came out of Plaintiffs home with hands up, and immediately saw dozens and dozens of uniformed RSO officers, wearing military-style vests and armed with what looked like assault rifles aimed directly at McCormick, along with what appeared to be a SWAT Team with a Mine-Resistant Ambush Protected heavily armored military truck used by RSO only for high-risk situations.  SGDF 18-121

33.    RSO officers immediately forced McCormick to lie face down in the dirt, then tightly handcuffed him behind the back, and took McCormick to the public road outside the Subject Property. After approximately one hour, McCormick began repeatedly advising RSO officers that handcuffs were causing pain and requesting that RSO officers please adjust them, but was told "***No!***" After approximately 3 more hours, he again advised the RSO officers that handcuffs were continuing to cause pain and would RSO please adjust them, but was again told "***No!***"   SGDF 33-66

34.    McCormick was left tightly handcuffed behind his back for approximately six hours while in significant pain. RSO officers ultimately moved the handcuffs to the front of Plaintiffs body, taking McCormick inside of RSO's mobile command center where the handcuffs were finally removed.  Due to McCormick's injuries sustained from

*Case No. 5:23-cv-02569-SSS-SP*
*Plaintiffs' Opposition to Defendants'*
*Motion for Summary Judgment*

these tightly bound handcuffs, both of wrists were swollen, ultimately required surgery to the right wrist and McCormick remains in continual pain.

35.     Defendant Investigator Jose Trujillo Villasenor ("Villasenor"), finally read McCormick his Miranda rights then asked me "*do you know why we're here?*" and I responded, "*no I do not know…*" because he had already offered to provide whatever documentation RSO wanted to make a determination that the cannabis cultivation agricultural business was lawful and located on the Subject Property was sovereign Indian tribal land.

36.     In response, Villasenor stated that "*your paperwork you brought to the station is worthless*" and I then asserted Plaintiffs right to remain silent and requested an attorney.

37.     After I had invoked Plaintiffs Miranda rights, another RSO officer, who did not identify himself to me, nevertheless came to RSO's  mobile command center trailer and demanded that I open the safe located in the Tribe's satellite office on the Subject Property, and threatened that if I did not immediately comply, the RSO would "*rip it open*."  I informed that unidentified RSO officer that I did not have the combination to the safe, that it belonged to the Tribe and not to me, and that he should contact the Tribe directly to get permission to open that safe.

38.     I was then pushed against RSO mobile command center trailer, patted down, and again tightly handcuffed behind Plaintiffs back for an additional 2-3 hours before being transported to the RSO Indio Station for eventual booking and incarceration.

25

39.     I was finally released from RSO custody at approximately 10:00 p.m., along with RSO issuing me a citation to appear in court.

40.     I eventually learned that the Tribe's legal counsel at that time, Mr. Thomas Weathers, at the direct request of the Tribe, had spoken with RSO and had produced documentation, including what I believe to be the BIA Deed of Trust, in order to legally validate the fact that the Subject Property was the Tribe's sovereign Indian tribal land and that Plaintiffs cannabis cultivation agricultural facility was located squarely on the Subject Property, to the satisfaction of the RSO such that all charges against me were terminated such that the Riverside County District Attorney's Offices has never  commenced any form of criminal action or prosecution against me.

41.     On December 8, 2022, the day after the raid by RSO, Plaintiffs returned to inspect Plaintiffs' family home on the Subject Property and found that the electrical power to the entire Subject Property had been previously cut-off and disconnected at the commencement of RSO's illicit raid, consequently leaving the entire Subject Property without any source of water since well water pump was cut-off from electrical power. Prior to that raid, there had been no problems with or interruptions to the electrical power to the Subject Property.

42.     When Plaintiffs returned to the Subject Property on December 8, 2022, they discovered that the RSO, including Villasenor, had purposefully and completely destroyed Plaintiffs' entire lawful agricultural facility, including ripping up all the properly tagged and accounted for cannabis plants still under cultivation that were

26

only weeks away from being ready for harvest, knocking down all the greenhouses (even those without cannabis under cultivation), destroying all fencing and irrigation systems, pulling out the computers, surveillance, and communications systems from sockets and walls, completely ransacking Plaintiffs' family home and the Tribe's satellite office by rummaging through and removing thousands of documents from filing cabinets and leaving everything in total shambles, prying open the safe located in Plaintiffs family home and confiscating money that rightfully belonged to Plaintiffs, and forcing members of the Tribe under threat of arrest to open up the Tribe's safe at the Tribe's satellite office located on the Subject Property and confiscating thousands of dollars that belonged to the Tribe.

43.    On or about January 8, 2023, Plaintiffs' former residence at the Subject Property caught fire. The Subject Property is served by a water well which requires power in order to pump the water and, as the power to the Subject Property had been cut at the time RSO's illicit raid commenced and remained off, the Fire Department had no access to water in order to be able to extinguish or fight the fire, leaving Plaintiffs' entire family home to burn down, along with Plaintiffs family's personal possessions.

44.    At the time that RSO raided the Subject Property, Plaintiffs very first crop of cannabis plants were not fully matured and weeks away from being harvested, such that Plaintiffs nor independent farmer contractors conducted any form of harvesting of any of the cannabis plants that remained under cultivation on the Subject

Property and, therefore, the Tribe did not and could not conduct any form of processing, distribution, sale, or transportation of any cannabis or cannabis related products.

### III.   STANDARD OF REVIEW

Defendant bears the burden of showing not only the absence of a genuine issue of material fact, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), but also of demonstrating that there is an absence of evidence to support the Counter Claim. *Id.* at 325. A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986). Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for a summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254-55.

Public policy strongly favors disposition of cases on the merits. *In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*,460 F.3d 1217, 1228 (9th Cir. 2006)

### IV.   ARGUMENT

**A. The Parties' Stipulation was Intended to Resolve Only Procedural Issues and is Not Dispositive for Summary Judgment.**

District courts have the discretion to interpret the intent of the parties based on the language of the stipulation to avoid manifest injustice. *See, generally, U.S. v. Culter*, 676 F.2d 1245 (9th Cir. 1982). Court may grant relief from stipulations entered into as a result of mistake of law or fact, or that the facts have changed. *Stahlin v. Hilton Hotels Corp.*, 484 F.2nd 580, 584 (7th Cir. 1973)).

The admissions at issue resulted from Defendants discovery tactics in an attempt to establish legal conclusions and render undisputed material facts of the case which are "*per se* impermissible." *See Jefferson v. Perez*, 2012 WL 671917, at *2 (E.D. Cal. Feb. 29, 2012); *see also Taylor v. Cnty. of Calaveras*, 2019 WL 6341131, at *4 (E.D. Cal. Nov. 27, 2019). Rule 36(b) is "not to be used in an effort to 'harass the other side' or in the hope that a party's adversary will simply concede essential elements." *Conlon v. U.S.*, 474 F.3d 616, 622; citing *Perez v. Miami-Dade Cnty.*, 297 F.3d 1255, 1268 (11th Cir. 2002). Furthermore, the Plaintiffs firmly rejected these admissions.

Upon advising Defendants that Plaintiffs will withdraw all 132 admissions, Defendants threatened that they would seek attorney's fees and sanctions and, when Plaintiffs sought just that, Defendants refused to promptly return the proposed Joint Stipulation or to provide authorization to affix Defendants' electronic signature to move forward with Plaintiffs Motion to Withdraw. Plaintiff had no viable option but to capitulate to Defendants by stipulating to only withdraw only 32 of these 132 impermissible admissions.

The purpose and intent of that Stipulation is set forth in the plain language of the very first paragraph: "as part of Plaintiffs' forthcoming Motion to Withdraw and Amend Admissions, to resolve any **procedural issues** regarding the timing and scope of Plaintiffs' Motion."

Plaintiffs agreed to enter into this procedural stipulation deeming all other admissions admitted for the express purpose of advancing Plaintiffs' initial Motion to Withdraw; however, Plaintiffs reserved their right to withdraw the remaining 100 admissions or adequately modify or set aside this Stipulation in order to do so.

Plaintiff never intended for that Stipulation to serve as a complete bar, much less a means for Defendants to move for summary judgment or at trial of this case and the plain language of such Stipulation is completely devoid of any such representation

The Court should fairly interpret the express language as set forth in this stipulation to resolve procedural issues only, and not as a basis for summary judgment.

**B. The Facts Presented By Plaintiffs Conclusively Demonstrate A Monell Claim (42 U.S.C. § 1983)**

To prove their Monell claim, Plaintiffs must demonstrate facts that show: (1) Plaintiffs had a constitutional right of which they were deprived; (2) the Defendants had a policy; (3) the policy amounts to deliberate indifference to Plaintiffs' constitutional right; and (4) the policy is the moving force behind the constitutional violation. 42 U.S.C. § 1983. *See Gordon v. Cnty. of Orange*, 6 F.4th 961, 973–74 (9th Cir. 2021).

Case No. 5:23-cv-02569-SSS-SP
*Plaintiffs' Opposition to Defendants'*
*Motion for Summary Judgment*

The Fourth Amendment to the Constitution guarantees everyone the right to be free from unreasonable searches and seizures" *U.S. Const. amend. IV*

A plaintiff could establish "direct" liability of a County by showing its policies and procedures failed to adequately screen and protect the rights of plaintiff (mentally ill detainees right to medical care.). *Gordon, supra,* 6 F.4th at 969; *citing, Gibson v. County of Washoe*, 290 F.3d 1175, 1194–96 (9th Cir. 2002) An unconstitutional policy need not be formal or written to create "municipal" liability under Section 1983. *Id.*

Against all Plaintiffs' 1983 causes, Defendants also assert qualified immunity. In evaluating a claimed defense of qualified immunity, a court considers whether (1) the state actor's conduct violated a constitutional right and (2) the right was clearly established at the time of the alleged misconduct. *Gordon, supra*, 6 F.4th at 965

The facts in dispute demonstrate that Villasenor (a "state actor") lied on his Affidavit to obtain a search Warrant. SGDF 21, 128, 203, 210, 256.  As a result of Defendants' execution of that Warrant, Plaintiffs' entire lawful business was destroyed.  RSO had a tacit policy of allowing Villasenor to assert false facts by Affidavit and use the resulting Warrant to violate Plaintiffs' constitutional rights.

**C. The Facts Presented By Plaintiffs Conclusively Demonstrate Supervisory Liability for "Failure to Hire, Train, Supervise, and Discipline" (42 U.S.C. § 1983).**

To prove their claim for failure to train, a plaintiff must show: (1) a

31

constitutional violation; (2) a municipal training policy that amounts to a deliberate indifference to constitutional rights; and (3) that the constitutional injury would not have resulted if the municipality properly trained their employees. *Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1153-54 (9th Cir. 2021).

All the factual elements of such claim are abundantly apparent in this case: (1) by executing a facially invalid Warrant obtained by fraud, Villasenor violated Plaintiffs' constitutional rights resulting in the complete destruction of Plaintiffs' business and livelihood; (2) RSO's policies and customs constituted an ingrained indifference to such constitutional rights, allowing Villasenor to run rampid with no supervision or oversight; and (3) RSO failed to train, supervise, and discipline Villasenor to the point this Defendant acted with impunity, intentionally targeting McCormick and East Wind Ag without any regard for Plaintiffs constitutional rights. SGDF 21, 128, 203, 210, 256.

**D. The Facts Presented By Plaintiffs Conclusively Demonstrate A Failure To Protect From Harm (42 U.S.C. § 1983)**

The Fourteenth Amendment prohibits any seizure of "life, liberty, or property" without due process of law. *U.S. Const. amend. XIV*

The analysis in *Gordon, supra*, provides guidance here. Again, Plaintiff can show "direct" liability of Defendant County illuminating policies and procedures failed to adequately screen and protect the rights of plaintiff (mentally ill detainees right to medical care.). *Gordon, supra,* 6 F.4th at 969; *citing, Gibson v. County of*

Case No. 5:23-cv-02569-SSS-SP
*Plaintiffs' Opposition to Defendants'*
*Motion for Summary Judgment*

*Washoe*, 290 F.3d 1175, 1194–96 (9th Cir. 2002).  Once more, County's unconstitutional policy need not be formal or written to create "municipal" liability under Section 1983. *Id*.

There is no debate that, by submitting his Affidavit, Villasenor made material to get and execute the Search Warrant. SGDF 21, 128, 203, 210, 256. Plaintiffs' livelihood was reduced to rubble as a result.  RSO repeated ignorance of Villasenor's actions violated Plaintiffs' constitutional rights.

**E. The Facts Presented By Plaintiffs Conclusively Demonstrate A Failure To Provide Medical Care (42 U.S.C. § 1983)**

Once again, *Gordon* is illustrative. In that case, the Ninth Circuit found that the inadequate medical care was sufficient to withstand summary judgment. *Gordon, supra,* 6 F.4th at 970.

Mr. McCormick was knowingly handcuffed behind his back by Defendants for hours on end, repeatedly complained of pain, and received no medical care.  SGDF 16, 236, 238  From Villasenor's "investigation," Defendants knew McCormick was a disabled veteran, yet denied care.  SGDF 236, 238

**F. The Facts Presented By Plaintiffs Conclusively Demonstrate Negligence.**

A state law claim for negligence can be established by showing "(a) a legal duty to use due care; (b) a breach of such legal duty; [and] (c) the breach as the proximate or legal cause of the resulting injury." *Ladd v. County of San Mateo,* 12

Cal.4th 913, 917 (1996).

The facts demonstrate that a Villasenor, as law enforcement officer, owed Plaintiffs (1) a legal duty to "use care" when investigating, obtaining a warrant, searching and seizing (destroying) Plaintiffs' licensed cannabis cultivation agricultural facility; (2) breached that duty by using a facially false Search Warrant based on false statements, and (3) Defendants' breach caused the destruction of Plaintiffs entire business. SGDF 16, 65, 70.

Defendants' negligence is self-evident.

**G. The Facts Presented By Plaintiffs Conclusively Demonstrate Battery.**

"'It has long been established, both in tort and criminal law, that "the least touching" may constitute battery. In other words, force against the person is enough; it need not be violent or severe, it need not cause bodily harm or even pain, and it need not leave any mark.' " *People v. Mansfield*, 200 Cal.App.3d 82, 88 (1988) (internal citations omitted).

Mr. McCormick was knowingly "touched" while being handcuffed behind his back face down in the dirt and then held for countless hours while repeatedly complaining of pain but receiving no help or aid. SGDF 16, 236, 238 etc. As a disabled vet, Defendants knew needed help yet ignored it. SGDF 236, 238

**H. The Facts Presented By Plaintiffs Conclusively Demonstrate Assault.**

"Generally speaking, an assault is a demonstration of an unlawful intent by one person to inflict immediate injury on the person of another then present." *Plotnik v.*

*Meihaus* 208 Cal. App. 4th 1590, 1603-1604 (2012) "A civil action for assault is based upon an invasion of the right of a person to live without being put in fear of personal harm." *Lowry v. Standard Oil Co. of California* (1944) 63 Cal.App.2d 1, 6-7 (internal citation omitted.)

During the course of Defendants' execution of an unlawful raid based on false Affidavit, Mr. McCormick pinned to the ground his back face down in the dirt, handcuffed behind his bac, and then held for countless hours while his complaints of pain went unanswered. SGDF 16, 236, 238 Defendants ignored Plaintiffs' disabled condition. SGDF 236, 238

**I. The Facts Presented By Plaintiffs Conclusively Demonstrate Intentional Interference with Contractual Relations.**

This is a common law state claim, resounding in tort. "California recognizes a cause of action against noncontracting parties who interfere with the performance of a contract. "It has long been held that a stranger to a contract may be liable in tort for intentionally interfering with the performance of the contract." *Redfearn v. Trader Joe's Co.* (2018) 20 Cal.App.5th 989, 997.

Defendants knew Plaintiffs had License issued by the Tribe, but commenced their illicit raid totally destroying all plants, fertilizers, and infrastructure that most certainly interfered with Plaintiffs' performance based on the License with the Tribe. SGDF 136-138, 158-159, 256.

**J. The Facts Presented By Plaintiffs Conclusively Demonstrate**

**Intentional Interference with Prospective Economic Advantage.**

A parallel analysis as above.  This tort imposes liability for improper methods of disrupting or diverting the business relationship of another which fall outside the boundaries of fair competition." *Settimo Associates v. Environ Systems, Inc.* 14 Cal.App.4th 842, 845 (1993).

Prior to the presentation of his License, Defendants were appraised of Plaintiffs business relationship with the Tribe by course of investigation.  Defendants knowingly disrupted that relationship, decimating Plaintiffs' entire business.  The actions of Defendants go far beyond the meets and bounds of "fair competition. SGDF 136-138, 158-159, 256

**K. Defendants Had No Authority to Attempt to Enforce State Law on Sovereign Indian Tribal Land.**

Courts have long recognized that Congress has "plenary and exclusive authority" over Indian affairs. *Michigan v. Bay Mills Indian Cmty*. (2014) 572 U.S. 782, 788-90.  This exclusive authority is rooted in the Indian commerce clause (art. I, § 8, cl. 3) and the supremacy clause (art. VI, cl. 2) of the United States Constitution. *United States v. Forty-Three Gallons of Whiskey,* 93 U.S. 188, 194 (1876); *Seminole Tribe v. Fla.* 517 U.S. 44, 62 (1996) ("This is clear enough from the fact that the States …have been divested of virtually all authority over Indian commerce and Indian tribes.").

A state may not attempt to regulate property or conduct in "Indian country". (see, e.g., *McClanahan v. Arizona State Tax Comm'n,* 411 U.S. 164, 168 (1973). This principle is binding law directly dispositive in relationship to this case.

In the context of this case, it bears repeating that neither 18 U.S.C. § 1162 nor any other Act of Congress conferred any jurisdiction authorizing any of the Defendants to commit any of the acts alleged in the Complaint, including but not limited to submitting an Affidavit or seeking issuance of the Search Warrant at issue in this case, rendering such Search Warrant void *ab initio* and rendering the execution of such Search Warrant as well as the many other acts associated therewith as *ultra vires* and contrary to federal law governing jurisdiction in "*Indian country*." (emphasis added).

**L. California's Cannabis Laws Are Civil Regulatory not Criminal Prohibitory and Cannot be Enforced on Sovereign Indian Tribal Land.**

Defendants lacked all authority to enforce state laws within Indian country absent express congressional authorization. *Accord, McClanahan, supra,* 411 U.S. 164, 170-171 (1973).

This jurisdictional limitation extends to both state courts and law enforcement. *See*, *Fisher v. District County Court*, 424 U.S. 382, 387-88 (1987); *County of Oneida v. Oneida Indian Nation*, 470 U.S. 226 (1985).

Defendants make a belated after the fact attempt to rely on Public Law 280 ("P.L. 280"). Nevertheless, P.L. 280 confers only limited authority: it allows state

courts to adjudicate private civil disputes that arise in Indian country and permits enforcement of state **criminal prohibitory laws**, but nothing more. 28 U.S.C. § 1360; *Bryan v. Itasca County*, 426 U.S. 373, 389 (1976).

The Supreme Court has drawn a bright-line between **criminal/prohibitory laws**, enforced by states under P.L. 280, and **civil/regulatory laws**, which may not. *California v. Cabazon Band of Indians*, 480 U.S. 202, 208 (1987). If a state law prohibits conduct as a matter of public policy, it is criminal/prohibitory. If the law permits the conduct but regulates it, it is civil/regulatory and unenforceable in Indian country. *Id*. at 209; *see also Barona Grp. of Capitan Grande Band of Mission Indians v. Duffy*, 694 F.2d 1185 (9th Cir. 1982).

California's cannabis laws fall squarely into civil/regulatory law. With passage of Proposition 64 (the Adult Use of Marijuana Act ("AUMA"), California established a comprehensive framework for the cultivation, processing, distribution, and sale of cannabis. Cal. Health & Safety Code § 11362.1 et seq.; Cal. Bus. & Prof. Code § 26000 et seq.  AUMA legalizes personal use and cultivation of cannabis, establishes a licensing system for **commercial cannabis operations**, imposes taxes and authorizes local governments to regulate or prohibit commercial activity. Cal. Health & Safety Code § 11362.1-.4.

These laws in no way "prohibit" cannabis activity as a matter of public policy but, instead, lawfully permit and then regulate. The state's interest lies in controlling

Case No. 5:23-cv-02569-SSS-SP
*Plaintiffs' Opposition to Defendants'*
*Motion for Summary Judgment*

the nature of cannabis use and not in banning it outright. This is the hallmark of a civil regulatory scheme under *Cabazon*.

Moreover, such unlawful attempts at enforcing California's civil/regulatory cannabis laws not only violates the Tribe's sovereign authority, but also causes irreparable harm. Courts have consistently recognized that unlawful state encroachments on tribal jurisdiction constitute irreparable injury. *See EEOC v. Karuk Tribe Hous. Auth.*, 260 F.3d 1071, 1077 (9th Cir. 2001)

Defendant Villasenor purposefully disregarded the civil/regulatory nature of P.L. 280 as an excuse to target Plaintiffs and Plaintiffs' lawful business for arrest and destruction.

## V.     CONCLUSION

For the foregoing reasons, Defendants motion for summary judgment must be denied.

Dated: January 16, 2026

/s/ Gregory Morrow_____
Gregory J. Morrow

Case No. 5:23-cv-02569-SSS-SP
*Plaintiffs' Opposition to Defendants'*
*Motion for Summary Judgment*

## CERTIFICATE OF COMPLIANCE

The undersigned counsel of record for Plaintiffs Preston McCormick and East Wind Ag certifies that this brief contains 6,328 words which complies with the word limit of L.R. 11-6.1 and with the Court's Order dated December 21, 2023.

Dated: January 16, 2026

/s/ Gregory Morrow_____
Gregory J. Morrow

Case No. 5:23-cv-02569-SSS-SP
*Plaintiffs' Opposition to Defendants'
Motion for Summary Judgment*